FILED

OCT 23 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

1  David Avila
   8651 Crane Road
2  Oakdale, Calif. [95361]
   (209) 595-5597
3  davidavilla@dairydesigners.com
   Sui juris
4

5              UNITED STATES DISTRICT COURT

6          FOR THE EASTERN DISTRICT OF CALIFORNIA

7
   David Avila,                    | Case No.: 2:24-cv-2264-TLN-CSK
8
   John Hayne,                     |
9                                  |
   PLAINTIFFS,                     | RESPONSE AND OBJECTIONS TO
10                                 | DEFENDANTS, NEWREZ LLC D/B/A/
   vs.                             | SHELLPOINT MORTGAGE SERVICING, &
11                                 | JP MORGAN MORGAN ACQUISITION
   NEWREZ LLC, d/b/a SHELLPOINT    | CORP.  MOTION TO DISMISS
12 MORTGAGE SERVICING, et al,      | (RESPONSE TO ECF 17)
13                                 |
14                                 |
          DEFENDANTS,              |
15

16

17              I.      INTRODUCTION

18 DEFENDANTS' Motion to Dismiss fundamentally misrepresents the nature and

19 substance of PLAINTIFFS' claims and relies on legal conclusions and speculation that

20 are premature and inappropriate for resolution at this stage of the proceedings.

21 PLAINTIFFS have filed a well-founded civil action, supported by numerous

22 substantive allegations founded on a preponderance of evidence under federal and

23 state law, addressing improper foreclosure and business practices, including the

24 wrongful imposition of force-placed insurance policies despite the existence of valid

25

26 private insurance maintained by PLAINTIFF

27

28                              1

PLAINTIFFS' complaint clearly articulates claims upon which relief can be granted, as required by Federal Rule of Civil Procedure 12(b)(6), and is supported by detailed factual allegations that must be accepted as true for the purposes of this motion. Moreover, the motion to dismiss is undermined by multiple factual disputes that remain unresolved. These factual disputes are critical to determining the rights and obligations of the parties and should be addressed through discovery and adjudication, PLAINTIFFS strongly oppose the entirety of DEFENDANTS' Motion to Dismiss and their mischaracterizations and request that the Court deny the motion in full, allowing the case to proceed so that all facts may be fully developed and justly resolved. PLAINTIFFS  hereby oppose DEFENDANTS' Motion to Dismiss for the reasons herein. DEFENDANTS' motion should be denied entirety so that all factual disputes may be properly resolved, not summarily dismissed.

## II.    LEGAL STANDARD

With a motion to dismiss, the court must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. The complaint must allege enough facts to state a claim for relief that is plausible on its face. As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and reaffirmed in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." 9th Circuit follows this approach, emphasizing that dismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a claim. In *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011), the court noted that, in ruling on a motion to

2

1   dismiss, "a court must accept as true all material allegations in the complaint and must

2   construe the complaint in the light most favorable to the plaintiff." The court further

3   explained in *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009), that the

4   plaintiff's claim must be plausible, and courts must draw all reasonable inferences in favor

5   of the plaintiff. Thus, the legal standard in the 9th Circuit mirrors the Supreme Court's

6   rulings in Twombly and Iqbal, focusing on the plausibility of the claims and the sufficiency

7   of the factual allegations, without evaluating the merits of the case at this stage.

8

9

10

11

## III.    ARGUMENT/ OBJECTIONS

12

13  PLAINTIFF objects to all of the arguments set forth by DEFENDANTS in their Motion to

14  Dismiss (ECF 17) in its entirety and contends that all claims presented are substantial, legitimate,

15  and grounded in fact and law, without any basis for being characterized as frivolous.

16  The Supreme Court in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002),

17  highlighted that a plaintiff is not required to plead all the evidence supporting their claims at the

18  outset. Dismissing the complaint at this stage would also deprive the PLAINTIFF of the

19  opportunity to conduct discovery, which is essential for uncovering evidence that supports the

20  claims. The DEFENDANTS' motion to dismiss should also be denied because it seeks to resolve

21  factual disputes at the pleading stage, which is inappropriate under Rule 12(b)(6).

22      Arguments raised by DEFENDANTS suggesting that the PLAINTIFF does not have

23  any legitimate claims should be rejected as a clear attempt to obstruct justice and deny the

24  PLAINTIFF his day in court. The facts and legal precedents support PLAINTIFF'S claims, and

25  this case deserves to proceed on its merits rather than being thwarted by procedural shamery.

26  Moreover, The DEFENDANTS' motion is insufficient, as it requests this court to consider

27  facts outside the record, which have not been presented in the form required by Rule

28                                                3

1    12(b)(6) or Rule 56(c). "Statements of counsel, while informative, are not sufficient for

2    purposes of granting a motion to dismiss or summary judgment", as established in

3    *Trinsey* v. *Pagliaro*, 229 F. Supp. 647 (1964).

4

5    **A.** <u>PLAINTIFFS Have Stated a Valid Claim Under the Fair Debt Collection Practices Act</u>

6    Shellpoint's Role as a Debt Collector:

7

8    DEFENDANTS argue that Shellpoint does not qualify as a debt collector under the FDCPA, but

9    PLAINTIFFS have sufficiently alleged that SHELLPOINT began servicing the loan after it was

10   already in default, thus making SHELLPOINT a debt collector as defined under the Act.

11   According to Barbato v. Greystone All., LLC, 916 F.3d 260, 267 (3d Cir. 2019), servicing a loan

12   in default constitutes debt collection activity under the FDCPA. Moreover, SHELLPOINT'S

13

14   enforcement of an allegedly invalid debt through foreclosure proceedings and its demand for

15   insurance payments also fall within the scope of the FDCPA. In McNair v. Maxwell & Morgan

16   PC, 893 F.3d 680, 684 (9th Cir. 2018), the court held that activities tied to foreclosure actions—

17   such as demanding payment on an extinguished or improper debt—qualify as debt collection

18   under the FDCPA. Moreover, in McNair When the lender attempted to collect homeowner

19   association assessments and other services it fell outside the scope of a typical non-judicial

20

21   foreclosure action in which the court ruled that the defendants were liable as debt collectors In

22   that context. Here, DEFENDANTS demanded force-placed insurance payments despite being

23   provided evidence that the PLAINTIFFS had already paid for a valid insurance policy. In

24   addition, DEFENDANTS ignored multiple notices sent by PLAINTIFFS pointing out these

25   errors, providing irrefutable evidence to support their claims.

26

27

28                                            4

In *Obduskey v. McCarthy & Holthus LLP*, the Ninth Circuit addressed the role of debt collectors in foreclosure proceedings. While the Supreme Court ultimately ruled that a business engaged in non-judicial foreclosure is not necessarily a "debt collector" under the FDCPA, the Ninth Circuit decision was significant in reinforcing the responsibilities of debt collectors and protecting borrowers against misleading collection practices. Further, in *Gonzalez v. J.P. Morgan Chase Bank, N.A.*, the court reinforced that FDCPA protections apply when debt collection practices involve misrepresentations regarding amounts owed. Given the preponderance of evidence in the operative complaint ( Exhibit 1) Shellpoint's role as a debt collector under the FDCPA, the Defendants are liable for these violations.

<u>Improper Force-Placed Insurance Constitutes an FDCPA Violation:</u>

PLAINTIFFS further allege that DEFENDANTS imposed force-placed insurance even though PLAINTIFFS maintained a valid homeowner's insurance policy. This conduct constitutes an actionable violation under the FDCPA, as the forced placement of unnecessary insurance amounts to an attempt to collect payments not legally owed. The Seventh Circuit's decision in *Saccameno v. Ocwen Loan Servicing, LLC*, 943 F.3d 1071, 1088 (7th Cir. 2019), underscores that the wrongful imposition of force-placed insurance is a clear FDCPA violation when it involves false or deceptive attempts to collect money.

DEFENDANTS' actions in imposing force-placed insurance despite the existence of a valid policy also directly violated the FDCPA's prohibition against deceptive practices, particularly under Title 15 U.S.C. § 1692e(2)(A) and § 1692f(6)(A). By falsely representing the legal status of the debt and coercing PLAINTIFFS to pay for an unnecessary second insurance policy, Defendants engaged in abusive practices that caused significant financial harm to the

5

1  PLAINTIFFS. Not only did this practice inflate the PLAINTIFFS' monthly mortgage payments

2  artificially, but it also contributed directly to the wrongful foreclosure proceedings that followed.

3

4  Also in , *Lusnak v. Bank of America, N.A.* (9th Circuit): Though not directly related to force-

5      placed insurance, this case involved a breach of contract claim where extra charges were

6      added to the loan violating the borrower's agreement.

7

8  Finally, concerning forced insurance, ironic as it may, four months ago, the PLAINTIFF AVILA,

9  sent certified mail (See page 49 of ECF 1, exhibit 1) enlightening, the DEFENDANTS

10 concerning an identical case of forced-insurance that DEFENDANT NEWREZ was forced to

11 settle, out of Michigan case # 1:21-cv-3350 *Cardin v. NewRez*. Subsequently, this notice was

12
13 sent out to all DEFENDANTS and ignored within indifference making defense argument on this

14 point failing miserably.

15                    FDCPA Violations: Concrete Financial Harm:

16 PLAINTIFFS have clearly established that DEFENDANTS' actions resulted in both financial

17 and emotional harm. The DEFENDANTS' imposition of force-placed insurance—despite
18
19 PLAINTIFFS' provision of proof of their existing insurance—violated the FDCPA. As a result,

20 PLAINTIFFS were unlawfully subjected to additional financial burdens, including increased

21 mortgage payments that encompassed inflated insurance premiums for a policy they did not

22 need. This imposition of force-placed insurance was not a mere administrative error but rather a
23
24 deliberate and deceptive tactic employed to extract unjustified payments from the PLAINTIFFS.

25 By inflating their monthly financial obligations, DEFENDANTS caused substantial financial

26 injury to the PLAINTIFFS, who were ultimately forced to withhold the erroneous insurance

27 charges from their mortgage payments. DEFENDANTS' refusal to accept the correct, adjusted

28                                            6

mortgage payments created the pretext for foreclosure proceedings, compounding the

PLAINTIFFS' financial injuries.

Relief in this count:

PLAINTIFFS have established that DEFENDANTS' conduct constitutes clear violations of the

FDCPA through the wrongful imposition of force-placed insurance and deceptive foreclosure

practices. Furthermore, SHELLPOINT and DEFENDANTS Weaponized peak Forclosure

services who have defaulted and not responded to the complaint. These actions have caused

PLAINTIFFS significant financial harm by unlawfully inflating their obligations, leading to the

initiation of foreclosure proceedings. Additionally, the emotional distress caused by these

violations further entitles PLAINTIFFS to relief. Accordingly, PLAINTIFFS are entitled to both

compensatory and statutory damages under the FDCPA for the harm caused by DEFENDANTS'

improper and deceptive debt collection practices.

**B.** PLAINTIFFS' Allegations of Fraud Are Sufficiently Specific Under Rule 9(b)

1.PLAINTIFFS Have Provided the Requisite Specificity:

DEFENDANTS argue that PLAINTIFFS have not met the pleading requirements under Rule

9(b) for fraud. However, PLAINTIFFS have provided detailed allegations, including the specific

misrepresentations by DEFENDANTS, the dates and content of those misrepresentations, and

the manner in which PLAINTIFFS relied on them to their detriment. These allegations are

sufficient under *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

2.Misrepresentations About the Validity of the Debt:

7

PLAINTIFFS specifically allege that DEFENDANTS misrepresented their authority to collect the debt and initiate foreclosure proceedings, despite the loan being extinguished through the "offer of performance." The Complaint alleges these misrepresentations were made to induce PLAINTIFFS into compliance, establishing intent to deceive.

Also, The DEFENDANTS' misrepresentations concerning the status of the mortgage, the imposition of forced-placed insurance, and their right to foreclose are clear indications of intent to deceive. DEFENDANTS knew that PLAINTIFFS had complied with their mortgage obligations by maintaining private insurance, yet they proceeded to demand payment for an additional insurance policy and threatened foreclosure when those payments were not made. Involving fraudulent actions regarding the assignment of the deed of trust and misrepresentation of mortgage-related charges, aligns well with this precedent. The court in *Shields v. Citytrust Bancorp, Inc.* also found that fraudulent misrepresentations in mortgage contracts could lead to actionable fraud claims when it involves financial injury and misleading disclosures. COMMON LAW FRAUD is to be stated with particularity, detailing the "who, what, when, where, and how" of the fraudulent conduct.

**C.** Plaintiffs Have Stated a Valid Claim for Quiet Title

1.Superior Title and Extinguishment of the Loan:

PLAINTIFFS allege that DEFENDANTS have no valid interest in the property due to the extinguishment of the loan through an "offer of performance." Under California Code of Civil Procedure § 761.020, PLAINTIFFS have adequately pled that they hold superior title, as the Deed of Trust is void due to DEFENDANTS' failure to provide evidence of assignment and ownership of the debt.

8

2.Standing to Assert Quiet Title:

Contrary to DEFENDANTS' assertions, PLAINTIFFS and AVILA has standing to pursue quiet title and other claims contrary to DEFENDANTS' argument, ECF 17 **C. -page 10,** because he has an ownership interest in the property and paid defendants who received AVILA'S check for years (Article I sec. 10, US constitution, "impairing obligation of Contracts") and has been directly harmed by DEFENDANTS' wrongful foreclosure actions. The issue of standing is a factual matter that should not be resolved at the motion to dismiss stage. See *Warth v. Seldin,* 422 U.S. 490, 501 (1975).

Lawful Injury from Cloud on Title:

PLAINTIFFS have alleged that the DEFENDANTS do not have a valid interest in the property due to defective assignments of the Deed of Trust and the failure to properly assign both the note and Deed of Trust. As a result, any actions taken by DEFENDANTS to foreclose on the property are legally invalid. The cloud on title created by these defective assignments has caused legal injury to the PLAINTIFFS, as they cannot sell, transfer, or refinance the property without resolving these issues. The PLAINTIFFS have a right to quiet title and remove any invalid claims against the property, as the DEFENDANTS have failed to demonstrate a valid, enforceable interest in the note and Deed of Trust.

*Yvanova v. New Century Mortgage Corp.* (Ninth Circuit) is a key case regarding quiet title actions. The court ruled that a borrower has standing to challenge a wrongful foreclosure based on a void assignment. PLAINTIFF claim of defective assignments, which failed to transfer both the note and deed of trust, is strongly supported by this precedent. Additionally, *Glaski v.*

9

*Bank of America* reiterated that plaintiffs could challenge assignments when the entity foreclosing does not have a valid claim to the property.

California Civil Code § 2932.5, which requires that assignments of deeds of trust be recorded, supports claims of quiet title when assignments are improperly executed or recorded.

UCC§ 3-308. PROOF OF SIGNATURES AND STATUS AS HOLDER IN DUE COURSE

(a) In an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings. If the validity of a signature is denied in the pleadings, the burden of establishing validity is on the person claiming validity, but the signature is presumed to be authentic and authorized unless the action is to enforce the liability of the purported signer and the signer is dead or incompetent at the time of trial of the issue of validity of the signature. If an action to enforce the instrument is brought against a person as the undisclosed principal of a person who signed the instrument as a party to the instrument, the plaintiff has the burden of establishing that the defendant is liable on the instrument as a represented person under Section 3-402(a).

(b) If the validity of signatures is admitted or proved and there is compliance with subsection (a), a plaintiff producing the instrument is entitled to payment if the plaintiff proves entitlement to enforce the instrument under Section 3-301, unless the defendant proves a defense or claim in recoupment. If a defense or claim in recoupment is proved, the right to payment of the plaintiff is subject to the defense or claim, except to the extent

10

the plaintiff proves that the plaintiff has rights of a holder in due course which are not

subject to the defense or claim. Therefore, PLAINTIFFS must gain inspection of the note

and deed of trust proving the authenticity of the endorsements and lawful chain of title

**D.** PLAINTIFFS' Claims for Breach of Contract and Trespass Are Well-Pled

PLAINTIFFS allege that DEFENDANTS breached the terms of the mortgage agreement by

failing to properly apply payments as required by law clouding the outstanding balance, initiating

fraudulent foreclosure despite compliance with insurance requirements. The allegations, taken as

true, establish a plausible claim for breach of contract.

Financial and Legal Injury Due to Refusal of Payments

PLAINTIFFS have alleged a clear breach of contract as the DEFENDANTS have refused to

accept timely mortgage payments and have wrongfully imposed additional financial obligations

that are not required under the mortgage agreement. Under California law, PLAINTIFFS are

entitled to enforce the terms of the original contract, which include regular monthly payments

and maintenance of adequate insurance, which PLAINTIFFS have provided.

The refusal to accept payments has directly caused financial injury to the PLAINTIFFS as it has

triggered the foreclosure process, despite the PLAINTIFFS' compliance with the terms of the

contract. The threatened foreclosure based on the refusal of valid payments is both legally

unjustifiable and financially harmful. this was also a violation of Real Estate Settlement

Procedure Act 12 CFR 1026.37 (g) as follows:

Cancellation of force-placed insurance. Within 15 days of receiving, from the borrower or

otherwise, evidence demonstrating that the borrower has had in place hazard insurance coverage

11

that complies with the loan contract's requirements to maintain hazard insurance,

a servicer must:

(1) Cancel the force-placed insurance the servicer purchased to insure the borrower's property;

(2) Refund to such borrower all force-placed insurance premium charges and related fees paid by such borrower for any period of overlapping insurance coverage and remove from the borrower's account all force-placed insurance charges and related fees for such period that the servicer has assessed to the borrower.

The PLAINTIFFS sent evidence of the hazard insurance which was ignored with indifference, therefore clouding the "owed" balance, creating a breach of contract with the unlawful allegations by the defendants concerning lack of payment and failure to perform. The PLAINTIFFS made good faith payments, which were not lawfully applied creating a clear breach of contract and a breach of duty of care by the DEFENDANTS

In *Montanez* v. *HSBC Mortgage Corp. USA* (Third Circuit) involved a class action lawsuit in which the plaintiffs alleged that the mortgage servicer wrongfully imposed force-placed insurance despite their having maintained valid homeowner's insurance. The plaintiffs argued that these unnecessary insurance charges were in breach of their mortgage contracts and violated state consumer protection laws. The court recognized that forced-placed insurance practices can constitute a **breach of contract** if the loan servicer acted outside the terms of the mortgage agreement.

In *Lusnak v. Bank of America, N.A.* (9th Circuit): , the case involved a breach of contract claim where extra charges were added to the loan violating the borrower's agreement.The court

held that mortgage servicers must adhere strictly to the terms of the loan agreements and that imposing unauthorized fees or charges could form the basis for breach of contract claims.

In *Ellsworth v. U.S. Bank, N.A.* (N.D. Cal.): this class action, plaintiffs alleged that U.S. Bank improperly charged them for force-placed insurance that far exceeded the cost of normal homeowner's insurance policies. The plaintiffs claimed the charges were a breach of contract, and the court found that the mortgage servicer may have violated the terms of the mortgage by imposing such charges without justification. The court highlighted that forced-placed insurance must comply with the terms set forth in the loan agreement, and any excessive or unnecessary insurance charges could lead to **breach of contract** claims.

*McNeely v. Wells Fargo* dealt with excessive or unnecessary charges being added to the loan, where the court supported the argument that this was a breach of the mortgage agreement. The court emphasized that servicers must adhere strictly to the terms of loan agreements and not impose unauthorized charges.

California Civil Code § 1636, which governs the interpretation of contracts in California, supports breach of contract claims when mortgage terms are violated by unauthorized charges.

<u>Violations of 12 CFR 1026.36 and 12 CFR 1024.37 Regarding the Force-Placed Insurance</u>:

Defendants further violated 12 CFR 1026.36(c)(1)(i), which mandates that servicers promptly credit mortgage payments as of the date they are received. PLAINTIFFS made timely payments as required by their mortgage contract, yet DEFENDANTS failed to apply these payments properly, directly leading to the improper foreclosure process. This refusal to accept valid payments violates federal regulations and forms a critical component of PLAINTIFFS' breach of contract claim.

13

Moreover, DEFENDANTS imposed force-placed insurance despite PLAINTIFFS providing evidence of valid hazard insurance coverage, violating 12 CFR 1024.37 (g). The regulation requires that within 15 days of receiving proof of the borrower's existing hazard insurance, the servicer must cancel the force-placed insurance, refund any premiums or fees paid, and remove any related charges from the borrower's account. PLAINTIFFS sent evidence of their valid insurance, but DEFENDANTS ignored this, continuing force-placed insurance. This failure to act under federal law is both a regulatory violation and a breach of the mortgage agreement.

PLAINTIFFS' trespass claim arises from DEFENDANTS' entry onto the property without a lawful right due to their lack of a valid security interest. DEFENDANTS' initiation of foreclosure proceedings when they lacked standing to do so constitutes a wrongful exercise of control over the property, supporting a claim for trespass, including the public record.

Trespass and Trespass Quare Clausum Fregit:

In *Starrh & Starrh Cotton Growers v. Aera Energy LLC* the Ninth Circuit recognized that a property owner can recover for trespass when there is an unlawful interference with property. This aligns with PLAINTIFF'S claim that DEFENDANTS interfered with your property by initiating foreclosure without a legal right to do so, constituting trespass. Similarly, in *Bank of America v. La Jolla Group II,* the court held that a foreclosure sale conducted without legal authority constituted a trespass upon the borrower's possessory rights. California Civil Code § 3334 provides trespass remedies involving unlawful possession or interference with property. DEFENDANTS' improper initiation of the foreclosure process, based on invalid and defective assignments of the Deed of Trust, constitutes a trespass on the Plaintiffs' property rights.

14

PLAINTIFFS have alleged that DEFENDANTS do not have standing to enforce the mortgage or foreclose on the property due to the defective assignments and lack of a valid chain of title. The foreclosure actions represent an unlawful interference with PLAINTIFFS' possessory rights to the property, causing direct and immediate harm. The threat of dispossession from their home without proper legal authority amounts to a substantial injury, both emotionally and financially, as PLAINTIFFS face the loss of their home without any lawful justification.

**E.** Violation of California Business & Professions Code § 17200 (UCL)

 PLAINTIFFS allege that DEFENDANTS engaged in unlawful and unfair practices by imposing force-placed insurance, misrepresenting their authority to foreclose, and failing to validate their debt. This conduct violates § 17200, which prohibits practices that are "unlawful, unfair, or fraudulent." PLAINTIFFS have adequately pled economic injury due to this practice. Coupled with the refusal to accept payments, constitutes an unfair practice intended to increase the likelihood of foreclosure and unlawfully profit from PLAINTIFFS' misfortune. These practices have resulted in substantial financial harm, including the escalation of insurance costs and the wrongful initiation of foreclosure. PLAINTIFFS are entitled to restitution for the economic injuries they have suffered as a result of these unlawful practices, as well as injunctive relief to prevent further harm. The 9th Circuit has repeatedly upheld claims under the UCL when deceptive practices harm consumers. In *Gibson v. World Savings & Loan Assn.*, the court found that a lender's imposition of unfair or unconscionable fees violated § 17200, particularly when it related to forced-placed insurance schemes that were designed to generate profits at the borrower's expense. Similarly, in *Beck v. Wells Fargo Home Mortgage*, addressed unfair

15

business practices in the context of mortgage servicing, supporting that misleading or excessive

charges, such as forced-placed insurance, can form the basis of a UCL claim. The forced- placed

insurance is being used as a tool for unjust financial gain via extortion.

**F.** Promissory estoppel claim is sufficient.

DEFENDANTS argue that PLAINTIFFS have failed to all facts sufficient to establish a claim

for promissory estoppel, asserting that the complaint lacks a clear and unambiguous promise,

reasonable reliance, substantial detriment, and damages. DEFENDANTS' contentions error in

both the pleading standards and the substance of allegations. 9th Circuit as well as have

recognized that PLAINTIFFS can survive dismiss a promissory estoppel claim by adequately

alleging core elements without needing to present exhaustive factual details at this stage.

PLAINTIFFS have sufficiently alleged a clear and unambiguous promise. 9th Circuit has

emphasized that, for purposes of a motion to dismiss, the complaint need not provide exhaustive

factual specificity but must present enough facts to make the claim plausible. In *Toscano v.

Greene Music*, 124 Cal.App.4th 685, 692 (2004), the court acknowledged that the promise must

be clear, but also that what constitutes clarity may depend on the circumstances and the

relationship between the parties.

PLAINTIFFS alleged that DEFENDANTS promised not to foreclose on the property while

payments were timely made, insurance requirements were fulfilled, and PLAINTIFFS complied

with their mortgage obligations. This is a straightforward and unambiguous promise, particularly

in the mortgage servicing context.

Further, in *Aceves v. U.S. Bank, N.A.*, 192 Cal.App.4th 218 (2011), the court held that a

servicer's promise to work with a borrower to avoid foreclosure can be sufficiently clear and

16

enforceable under promissory estoppel. PLAINTIFFS here are not relying on vague or informal discussions; they are pointing to specific promises tied to the mortgage agreement that the DEFENDANTS violated by initiating foreclosure despite PLAINTIFFS' compliance with their obligations, including providing evidence of valid insurance. Therefore, DEFENDANTS' argument that no specific promise has been pled fails.

PLAINTIFFS have also adequately alleged reasonable and foreseeable reliance. 9th Circuit reliance is considered reasonable where the circumstances suggest that the promisee's actions were justified given the nature of the promisor's representations (*Moncada v. West Coast Quartz Corp.*, 221 Cal.App.4th 768 (2013)). Here, PLAINTIFFS reasonably relied on Defendants' representations that foreclosure would not proceed if they met their obligations, including timely payments and insurance coverage.

In *Garcia v. World Savings, FSB*, 183 Cal.App.4th 1031 (2010), the court found that a borrower's reliance on a bank's assurances not to foreclose during negotiations was reasonable and foreseeable, especially when the borrower was complying with the loan terms. Similarly, PLAINTIFFS here relied on DEFENDANTS' assurances that as long as they complied with their obligations, foreclosure would not proceed. DEFENDANTS' failure to honor this promise led PLAINTIFFS to continue making payments and maintaining insurance, actions that they would not have taken had they known foreclosure was inevitable. Reliance was both reasonable and foreseeable under the circumstances. PLAINTIFFS have clearly pled substantial detriment resulting from their reliance on DEFENDANTS' promise. As the 9th Circuit opined in *US Ecology, Inc. v. State*, 129 Cal.App.4th 887, 901 (2005), reliance that leads to a substantial change in the plaintiff's position or financial injury can support a claim of promissory estoppel.

1    PLAINTIFFS have continued making payments and complied with all insurance requirements

2    based on DEFENDANTS' promise, only to face an unjust foreclosure. The resulting financial

3    loss from the foreclosure proceedings, along with the clouding of title and potential loss of their

4
     home, constitutes significant detriment.
5
6        In *West v. JPMorgan Chase Bank, N.A.*, 214 Cal.App.4th 780 (2013), the court found that

7    borrowers suffered a substantial detriment when they relied on promises from the lender not to

8    foreclose, only to find that the lender foreclosured anyway. Similarly, PLAINTIFFS relied on the

9    DEFENDANTS' assurances to their financial detriment. Under 9th Circuit precedent, damages
10
     are proper if the PLAINTIFF shows that their reliance on the promise caused financial harm,
11
12   such as increased costs or the loss of a property interest. In *Youngman v. Nev. Irrigation Dist.*, 70

13   Cal.2d 240 (1969), the court emphasized that damages in promissory estoppel claims are

14   measured by the extent of the promise relied upon and not performed.
15
         PLAINTIFFS allege that their reliance on DEFENDANTS' promise caused significant
16
17   financial harm, including wrongful foreclosure proceedings, legal fees, emotional distress, and

18   the potential loss of their home.

19       Moreover, 9th Circuit has held that such allegations are sufficient to withstand a motion to
20
     dismiss. In *Alvarez v. BAC Home Loans Servicing, L.P.*, 228 Cal.App.4th 941 (2014), the court
21
22   found that borrowers' financial harm resulting from reliance on promises to modify their loan

23   terms and refrain from foreclosure was sufficient to survive dismissal.

24       Finally, the argument raised in *Jirschik v. Farmers & Merch. Nat'l Bank, 107 Cal.App.2d 405,*

25   *406 (1951)*, that promissory estoppel claims require unconscionable injury and enrichment, is
26
     misplaced in this context. 9th Circuit has clarified that a promissory estoppel claim can succeed if
27

28                                                      18

the reliance caused substantial injury and the defendant unjustly benefited from the plaintiff's

reliance (*Moncada v. West Coast Quartz Corp.,* 221 Cal.App.4th 768 (2013)). DEFENDANTS

benefit unjustly from foreclosing on home while ignoring the contractual obligations and

promises that induced Plaintiffs to continue making payments and maintaining insurance.

<u>Applicability to expert wittness affidavit of Walker F. Todd</u>

Walker F. Todd's affidavit from 03-047488CZ in Michigan, an expert witness in the banking

industry includes principles to substantiate the PLAINTIFFS claims of unlawful mortgage

practices and wrongful foreclosure.

Todd's affidavit (see attachment 1) provides expert testimony regarding how banks generate

credit through bookkeeping practices rather than through the actual disbursement of tangible

money. This is critical in the context of PLAINTIFFS' claims, where DEFENDANTS engaged

in misrepresentation regarding the nature of the loan, as well as force-placed insurance, an

invalid assignment of the Deed of Trust, and fraud, all of which the PLAINTIFFS argue

contributed to their wrongful foreclosure.

**1**. Fraud and Misrepresentation:

The core of PLAINTIFFS' fraud and misrepresentation claims rests on the premise that the

DEFENDANTS, particularly SHELLPOINT and JP MORGAN, misrepresented legal standing to

enforce the loan and foreclosure. Todd's affidavit is crucial in establishing what was loaned was

merely "money of account" (credit), not actual "money of exchange" (lawful money).

This mirrors the PLAINTIFFS case in that JP MORGAN and SHELLPOINT allegedly

misrepresented the nature of the loan, asserting that they had provided "lawful money" or valid

financial consideration, when in fact, only credit was extended. Furthermore, this

misrepresentation extended to their right to foreclose, which Plaintiffs claim was based on

defective and invalid assignments. Todd's testimony demonstrates that bank-created credit

should not be treated as lawful money, which supports the PLAINTIFFS' claim that

DEFENDANTS committed fraud in asserting their right to foreclose.

**2**. Breach of Contract and Force-Placed Insurance:

PLAINTIFFS allege breach of contract due to the imposition of force-placed insurance despite

the Plaintiffs' private homeowner's insurance. Walker F. Todd's affidavit reinforces that banking

transactions often involve the creation of credit rather than actual money. This understanding

supports the PLAINTIFFS' claim that DEFENDANTS wrongfully imposed additional financial

burdens, force-placed insurance, while misrepresenting the nature of the debt.

*Ellsworth* supports this, where the court ruled that the imposition of force-placed insurance

without proper notice or justification can constitute a breach of contract. The similarity lies in

how DEFENDANTS wrongfully leveraged their financial relationship with PLAINTIFFS to

impose excessive costs, violating the loan agreement.

**3**. Quiet Title and Defective Assignment of Deed of Trust:

Plaintiffs seek to void the assignment of the Deed of Trust on grounds that it was fatally

defective, having failed to transfer both the note and the deed as required by California law

(*Domarad v. Fischer & Burke*). Todd's affidavit strengthens this claim by highlighting the

complex nature of credit and the invalidity of claims when there is no lawful money exchanged.

In *Yvanova* and *Glaski* provide further support, as they held that borrowers have the right to

challenge assignments in cases where a defective assignment leads to wrongful foreclosure. The

RESPONSE TO MOTION TO DISMISSED

application of Todd's analysis here reinforces the PLAINTIFFS' position that the assignments were invalid, giving JP Morgan no legal right to foreclose.

**4**. Violation of California Business and Professions Code § 17200:

The imposition of force-placed insurance, coupled with DEFENDANTS' misrepresentation of the validity of the loan and the amount owed, directly violates California Business and Professions Code § 17200. Todd's affidavit sheds light on the practice of leveraging bank-created credit and the deceptive nature of how loans are framed as involving real money, which is crucial in establishing the DEFENDANTS' unfair practices.

In *Gibson v. World Savings & Loan Assn.*, the court found that lenders could not impose force-placed insurance or other fees without justification, which directly applies to the PLAINTIFFS case. DEFENDANTS' attempts to force additional insurance payments despite PLAINTIFFS' existing coverage constitute an unfair business practice under § 17200.

Finally, Todd's affidavit reveals the fundamental misconceptions in banking and loan transactions and how banks create credit rather than disburse actual money. DEFENDANTS misrepresented the nature of their financial claims, fraudulently imposed force-placed insurance, and relied on invalid assignments in attempt to foreclose. With 9th Circuit case law supporting these arguments, the PLAINTIFFS' claims are plausible to survive a motion to dismiss.

## IV.    CONCLUSION

For the above mentioned reasons, PLAINTIFFS ask the court to deny defendants motion to dismiss. Should the Court find any curable deficiencies in the Complaint, PLAINTIFFS request leave to amend to cure any such deficiencies.

RESPONSE TO MOTION TO DISMISSED

Respectfully submitted,

David-Anthony:Avila
Sui juris

John Hayne
Sui juris

22

Note; Emphasis added to this affidavit with Yellow Highlighting!

## STATE OF MICHIGAN

### IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

|  |  |  |
|---|---|---|
| BANK ONE, N.A., | ) | Case No. 03-047448-CZ |
| Plaintiff, | ) | Hon. E. Sosnick |
| v. | ) | AFFIDAVIT OF WALKER F. TODD, EXPERT WITNESS FOR DEFENDANTS |
| HARSHAVARDHAN DAVE and PRATIMA DAVE, jointly and severally, | ) | |
| Defendants. | ) | |

| | |
|---|---|
| Harshavardhan Dave and Pratima H. Dave<br>C/o 5128 Echo Road<br>Bloomfield Hills, MI 48302<br>Defendants, *in propria persona* | Michael C. Hammer (P41705)<br>Ryan O. Lawlor (P64693)<br>Dickinson Wright PLLC<br>Attorneys for Bank One, N.A.<br>500 Woodward Avenue, Suite 4000<br>Detroit, Michigan 48226<br>(313) 223-3500 |

Now comes the Affiant, Walker F. Todd, a citizen of the United States and the State of Ohio over the age of 21 years, and declares as follows, under penalty of perjury:

1. That I am familiar with the Promissory Note and Disbursement Request and Authorization, dated November 23, 1999, together sometimes referred to in other documents filed by Defendants in this case as the "alleged agreement" between Defendants and Plaintiff but called the "Note" in this Affidavit. If called as a witness, I would testify as stated herein. I make this Affidavit based on my own personal knowledge of the legal, economic, and historical principles stated herein, except that I have relied entirely on documents provided to me, including the Note, regarding

1

623

certain facts at issue in this case of which I previously had no direct and personal knowledge. I am making this affidavit based on my experience and expertise as an attorney, economist, research writer, and teacher. I am competent to make the following statements.

## PROFESSIONAL BACKGROUND QUALIFICATIONS

2. My qualifications as an expert witness in monetary and banking instruments are as follows. For 20 years, I worked as an attorney and legal officer for the legal departments of the Federal Reserve Banks of New York and Cleveland. Among other things, I was assigned responsibility for questions involving both novel and routine notes, bonds, bankers' acceptances, securities, and other financial instruments in connection with my work for the Reserve Banks' discount windows and parts of the open market trading desk function in New York. In addition, for nine years, I worked as an economic research officer at the Federal Reserve Bank of Cleveland. I became one of the Federal Reserve System's recognized experts on the legal history of central banking and the pledging of notes, bonds, and other financial instruments at the discount window to enable the Federal Reserve to make advances of credit that became or could become money. I also have read extensively treatises on the legal and financial history of money and banking and have published several articles covering all of the subjects just mentioned. I have served as an expert witness in several trials involving banking practices and monetary instruments. A summary biographical sketch and resume including further details of my work experience, readings, publications, and education will be tendered to Defendants and may be made available to the Court and to Plaintiff's counsel upon request.

## GENERALLY ACCEPTED ACCOUNTING PRINCIPLES

2

6 2 4

3. Banks are required to adhere to Generally Accepted Accounting Principles (GAAP). GAAP follows an accounting convention that lies at the heart of the double-entry bookkeeping system called the Matching Principle. This principle works as follows: When a bank accepts bullion, coin, currency, checks, drafts, promissory notes, or any other similar instruments (hereinafter "instruments") from customers and deposits or records the instruments as assets, it must record offsetting liabilities that match the assets that it accepted from customers. The liabilities represent the amounts that the bank owes the customers, funds accepted from customers. In a fractional reserve banking system like the United States banking system, most of the funds advanced to borrowers (assets of the banks) <u>are created by the banks themselves</u> and are not merely transferred from one set of depositors to another set of borrowers.

## RELEVANCE OF SUBTLE DISTINCTIONS ABOUT TYPES OF MONEY

4. From my study of historical and economic writings on the subject, I conclude that a common misconception about the nature of money unfortunately has been perpetuated in the U.S. monetary and banking systems, especially since the 1930s. In classical economic theory, once economic exchange has moved beyond the barter stage, there are two types of money: money of *exchange* and money of *account*. For nearly 300 years in both Europe and the United States, confusion about the distinctiveness of these two concepts has led to persistent attempts to treat money of account as the equivalent of money of exchange. In reality, especially in a fractional reserve banking system, a comparatively small amount of money of exchange (e.g., gold, silver, and official currency notes) may support a vastly larger quantity of business transactions denominated in money of account. The sum of these transactions is the sum of credit extensions in the economy. With the exception of

3

625

customary stores of value like gold and silver, the monetary base of the economy largely consists of credit instruments. <u>Against this background, I conclude that the Note, despite some language about "lawful money" explained below, clearly contemplates both disbursement of funds and eventual repayment or settlement in money of account (that is, money of exchange would be welcome but is not required to repay or settle the Note).</u> The factual basis of this conclusion is the reference in the Disbursement Request and Authorization  to repayment of $95,905.16 to Michigan National Bank from the proceeds of the Note. That was an exchange of the credit of Bank One (Plaintiff) for credit apparently and previously extended to Defendants by Michigan National Bank. Also, there is no reason to believe that Plaintiff would refuse a substitution of the credit of another bank or banker as complete payment of the Defendants' repayment obligation under the Note. This is a case about exchanges of money of account (credit), not about exchanges of money of exchange (lawful money or even legal tender).

5. Ironically, the Note explicitly refers to repayment in "lawful money of the United States of America" (*see* "Promise to Pay" clause). Traditionally and legally, Congress defines the phrase "lawful money" for the United States. Lawful money <u>was</u> the form of money of exchange that the federal government (or any state) could be required by statute to receive in payment of taxes or other debts. Traditionally, as defined by Congress, lawful money only included gold, silver, and currency notes redeemable for gold or silver on demand. In a banking law context, lawful money was only those forms of money of exchange (the forms just mentioned, plus U.S. bonds and notes redeemable for gold) that constituted the reserves of a national bank prior to 1913 (date of creation of the Federal Reserve Banks). *See*, Lawful Money,

626

*Webster's New International Dictionary* (2d ed. 1950).   <u>In light of these facts, I</u>
<u>conclude that Plaintiff and Defendants exchanged reciprocal credits involving</u>
<u>money of account and not money of exchange; no lawful money was or probably</u>
<u>ever would be disbursed by either side in the covered transactions.</u>   This
conclusion also is consistent with the bookkeeping entries that underlie the loan
account in dispute in the present case.  Moreover, it is puzzling why Plaintiff would
retain the archaic language, "lawful money of the United States of America," in its
otherwise modern-seeming Note.  It is possible that this language is merely a legacy
from the pre-1933 era.  Modern credit agreements might include repayment language
such as, "The repayment obligation under this agreement shall continue until payment
is received *in fully and finally collected funds,*" which avoids the entire question of
"In what form of money **or credit** is the repayment obligation due?"

6.  *Legal tender,* <u>a related concept but one that is economically inferior to *lawful money*</u>
<u>because it allows payment in instruments that cannot be redeemed for gold or silver</u>
<u>on demand, has been the form of money of exchange commonly used in the United</u>
<u>States since 1933,</u> when domestic private gold transactions were suspended (until
1974)..  Basically, legal tender is whatever the government says that it is.  The most
common form of legal tender today is Federal Reserve notes, which by law cannot be
redeemed for gold since 1934 or, since 1964, for silver.   *See,* 31 U.S.C. Sections
5103, 5118 (b), and 5119 (a).


Note: I question the statement that fed reserve notes cannot be redeemed for silver since

1964. It was Johnson who declared on 15 Marcy 1967 that after 15 June 1967 that

Fed Res Notes would not be exchanged for silver and the practice did stop on 15 June

5

627

1967 – not 1964. I believe this to be error in the text of the author's affidavit.

7. *Legal tender under the Uniform Commercial Code (U.C.C.),* Section 1-201 (24) (Official Comment), is a concept that sometimes surfaces in cases of this nature.. <u>The referenced Official Comment notes that the definition of *money* is not limited to *legal tender* under the U.C.C.</u>  *Money* is defined in Section 1-201 (24) as "a medium of exchange authorized or adopted by a domestic or foreign government and includes a monetary unit of account established by an intergovernmental organization or by agreement between two or more nations."  The relevant Official Comment states that "The test adopted is that of sanction of government, whether by authorization before issue or adoption afterward, which recognizes the circulating medium as a part of the official currency of that government.  <u>The narrow view that money is limited to legal tender is rejected.</u>"  Thus, I conclude that the U.C.C. tends to validate the classical theoretical view of money.

## HOW BANKS BEGAN TO LEND THEIR OWN CREDIT INSTEAD OF REAL MONEY

8. In my opinion, the best sources of information on the origins and use of <u>credit as money</u> are in Alfred Marshall, MONEY, CREDIT & COMMERCE 249-251 (1929) and Charles P. Kindleberger, A FINANCIAL HISTORY OF WESTERN EUROPE 50-53 (1984).  A synthesis of these sources, as applied to the facts of the present case, is as follows:  As commercial banks and discount houses (private bankers) became established in parts of Europe (especially Great Britain) and North America, by the mid-nineteenth century they commonly made loans to borrowers by extending their own credit to the borrowers or, at the borrowers' direction, to third parties.  The typical form of such extensions of credit was drafts or bills of exchange drawn upon themselves (claims on the credit of the drawees) instead of disbursements of bullion,

628

coin, or other forms of money.  In transactions with third parties, these <u>drafts and bills</u> <u>came to serve most of the ordinary functions of money</u>.  The third parties had to determine for themselves whether such "credit money" had value and, if so, how much.  The Federal Reserve Act of 1913 was drafted with this model of the commercial economy in mind and provided at least two mechanisms (the discount window and the open-market trading desk) by which certain types of bankers' credits could be exchanged for Federal Reserve credits, which in turn could be withdrawn in lawful money.  Credit at the Federal Reserve eventually became the principal form of monetary reserves of the commercial banking system, especially after the suspension of domestic transactions in gold in 1933.  <u>Thus, credit money</u> is not alien to the current official monetary system; it is just rarely used as a device for the creation of Federal Reserve credit that, in turn, in the form of either Federal Reserve notes or banks' deposits at Federal Reserve Banks, <u>functions as money in the current</u> <u>monetary system.</u>  In fact, a means by which the Federal Reserve expands the money supply, loosely defined, is to set banks' reserve requirements (currently, usually ten percent of demand liabilities) at levels that would encourage banks to extend new credit to borrowers on their own books that third parties would have to present to the same banks for redemption, thus leading to an expansion of bank-created credit money.  In the modern economy, many non-bank providers of credit also extend book credit to their customers without previously setting aside an equivalent amount of monetary reserves (credit card line of credit access checks issued by non-banks are a good example of this type of credit), which also causes an expansion of the aggregate quantity of credit money.  The discussion of money taken from Federal Reserve and other modern sources in paragraphs 11 et seq. is consistent with the account of the

7

629

origins of the use of bank credit as money in this paragraph.

## ADVANCES OF BANK CREDIT AS THE EQUIVALENT OF MONEY

9. Plaintiff apparently asserts that the Defendants signed a promise to pay, such as a note(s) or credit application (collectively, the "Note"), in exchange for the Plaintiff's advance of funds, credit, or some type of money to or on behalf of Defendant. However, the bookkeeping entries required by application of GAAP and the Federal Reserve's own writings should trigger close scrutiny of Plaintiff's apparent assertions that it lent its funds, credit, or money to or on behalf of Defendants, thereby causing them to owe the Plaintiff $400,000. According to the bookkeeping entries shown or otherwise described to me and application of GAAP, the Defendants allegedly were to tender some form of *money* ("lawful money of the United States of America" is the type of money explicitly called for in the Note), securities or other capital equivalent to money, funds, credit, or something else of value in exchange (money of exchange, loosely defined), collectively referred to herein as "money," to repay what the Plaintiff claims was the *money* lent to the Defendants. **It is not an unreasonable argument to state that Plaintiff apparently changed the economic substance of the transaction from that contemplated in the credit application form, agreement, note(s), or other similar instrument(s) that the Defendants executed, thereby changing the costs and risks to the Defendants.** At most, the Plaintiff extended its own *credit* (money of account), but the Defendants were required to repay in *money* (money of exchange, and *lawful money* at that), **which creates at least the inference of inequality of obligations** on the two sides of the transaction (*money*, including *lawful money*, is to be exchanged for *bank credit*).

MODERN AUTHORITIES ON MONEY

8

630

11. To understand what occurred between Plaintiff and Defendants concerning the alleged loan of *money* or, more accurately, *credit*, it is helpful to review a modern Federal Reserve description of a bank's lending process. *See*, David H. Friedman, MONEY AND BANKING (4th ed. 1984)(apparently already introduced into this case): "The commercial bank lending process is similar to that of a thrift in that the receipt of cash from depositors increases both its assets and its deposit liabilities, which enables it to make additional loans and investments. . . . . When a commercial bank makes a business loan, it accepts as an asset the borrower's debt obligation (the promise to repay) and creates a liability on its books in the form of a demand deposit in the amount of the loan." (Consumer loans are funded similarly.) Therefore, the bank's original bookkeeping entry should show an increase in the amount of the asset credited on the asset side of its books and a corresponding increase equal to the value of the asset on the liability side of its books. **This would show that the bank received the customer's signed promise to repay as an *asset*, thus *monetizing* the customer's signature and creating on its books a liability in the form of a demand deposit or other demand liability of the bank.** The bank then usually would hold this demand deposit in a transaction account on behalf of the customer. Instead of the bank lending its *money* or other assets to the customer, as the customer reasonably might believe from the face of the Note, the bank *created* funds for the customer's transaction account without the customer's permission, authorization, or knowledge and delivered the *credit* on its own books representing those funds to the customer, meanwhile alleging that the bank lent the customer *money*. If Plaintiff's response to this line of argument is to the effect that it acknowledges that it lent credit or issued credit instead of money, one might refer to Thomas P. Fitch, BARRON'S

9

631

BUSINESS GUIDE DICTIONARY OF BANKING TERMS, "Credit banking," 3.

"Bookkeeping entry representing a deposit of funds into an account." But Plaintiff's

loan agreement apparently avoids claiming that the bank actually lent the Defendants

*money*.   They apparently state in the agreement that the Defendants are obligated to

repay Plaintiff principal and interest for the "Valuable consideration (money) the

bank gave the customer (borrower)." The loan agreement and Note apparently still

delete any reference to the bank's receipt of actual cash value from the Defendants

and exchange of that receipt for actual cash value that the Plaintiff banker returned.

12. According to the Federal Reserve Bank of New York, money is anything that has

value that banks and people accept as money; money does not have to be issued

by the government. For example, David H. Friedman, I BET YOU THOUGHT. . . .

9, Federal Reserve Bank of New York (4th ed. 1984)(apparently already introduced

into this case), explains that banks create new money by depositing IOUs, promissory

notes, offset by bank liabilities called  checking account balances. Page 5 says,

"Money doesn't have to be intrinsically valuable, be issued by government, or be in

any special form. . . ."

13. The publication, Anne Marie L. Gonczy, MODERN MONEY MECHANICS 7-33,

Federal Reserve Bank of Chicago (rev. ed. June 1992)(apparently already introduced

into this case), contains standard bookkeeping entries demonstrating that *money*

ordinarily is recorded as a bank *asset*, while a bank *liability* is evidence of *money* that

a bank owes. The bookkeeping entries tend to prove that banks accept cash, checks,

drafts, and promissory notes/credit agreements (assets) as *money* deposited to create

credit or checkbook money that are bank *liabilities*, which shows that, absent any

right of setoff, banks owe *money* to persons who deposit *money*.. Cash (money of

632

exchange) is money, and credit or promissory notes (money of account) become money when banks deposit promissory notes with the intent of treating them like deposits of cash. *See*, 12 U.S.C. Section 1813 (*l*)(1) (definition of "deposit" under Federal Deposit Insurance Act). The Plaintiff acts in the capacity of a lending or banking institution, and the newly issued credit or money is similar or equivalent to a promissory note, which may be treated as a deposit of money when received by the lending bank. Federal Reserve Bank of Dallas publication MONEY AND BANKING, page 11, explains that when banks grant loans, they create new money. The new money is created because a new "loan becomes a deposit, just like a paycheck does." MODERN MONEY MECHANICS, page 6, says, "What they [banks] do when they make loans is to accept promissory notes in exchange for credits to the borrowers' transaction accounts." The next sentence on the same page explains that the banks' assets and liabilities increase by the amount of the loans.

## COMMENTARY AND SUMMARY OF ARGUMENT

14. Plaintiff apparently accepted the Defendants' Note and credit application (money of account) in exchange for its own credit (also money of account) and deposited that credit into an account with the Defendants' names on the account, as well as apparently issuing its own credit for $95,905.16 to Michigan National Bank for the account of the Defendants. One reasonably might argue that the Plaintiff recorded the Note or credit application as a loan (money of account) from the Defendants to the Plaintiff and that the Plaintiff then became the borrower of an equivalent amount of money of account from the Defendants.

15. The Plaintiff in fact never lent any of its own pre-existing money, credit, or assets as consideration to purchase the Note or credit

11

633

**agreement from the Defendants.** (Robertson Notes: I add that when the bank does the forgoing, then in that event, there is an utter *failure of consideration* for the "loan contract".) When the Plaintiff deposited the Defendants' $400,000 of newly issued credit into an account, the Plaintiff created from $360,000 to $400,000 of new money (the nominal principal amount less up to ten percent or $40,000 of reserves that the Federal Reserve would require against a demand deposit of this size). The Plaintiff received $400,000 of credit or money of account from the Defendants as an asset. GAAP ordinarily would require that the Plaintiff record a liability account, crediting the Defendants' deposit account, showing that the Plaintiff owes $400,000 of money to the Defendants, just as if the Defendants were to deposit cash or a payroll check into their account.

16. The following appears to be a disputed fact in this case about which I have insufficient information on which to form a conclusion: I infer that it is alleged that Plaintiff refused to lend the Defendants Plaintiff's own money or assets and recorded a $400,000 loan from the Defendants to the Plaintiff, which arguably was a $400,000 deposit of money of account by the Defendants, and then when the Plaintiff repaid the Defendants by paying its own credit (money of account) in the amount of $400,000 to third-party sellers of goods and services for the account of Defendants, the Defendants were repaid their loan to Plaintiff, and the transaction was complete.

17. I do not have sufficient knowledge of the facts in this case to form a conclusion on the following disputed points: None of the following material facts are disclosed in the credit application or Note or were advertised by Plaintiff to prove that the Defendants are the true lenders and the Plaintiff is the true borrower. **The Plaintiff is trying to use the credit application form or the Note to persuade**

12

634

<u>**and deceive the Defendants into believing that the opposite occurred**</u>

<u>**and that the Defendants were the borrower and not the lender.**</u>  The

following point is undisputed:  The Defendants' loan of their credit to Plaintiff, when

issued and paid from their deposit or credit account at Plaintiff, became money in the

Federal Reserve System (subject to a reduction of up to ten percent for reserve

requirements) as the newly issued credit was paid pursuant to written orders,

including checks and wire transfers, to sellers of goods and services for the account of

Defendants.

### CONCLUSION

18. Based on the foregoing, Plaintiff is using the Defendant's Note for its own purposes,

and it remains to be proven whether Plaintiff has incurred any financial loss or actual

damages (I do not have sufficient information to form a conclusion on this point).  In

any case, the inclusion of the "lawful money" language in the repayment clause of the

Note is confusing at best and in fact may be misleading in the context described

above.

### AFFIRMATION

19. I hereby affirm that I prepared and have read this Affidavit and that I believe the

foregoing statements in this Affidavit to be true.  I hereby further affirm that the basis

of these beliefs is either my own direct knowledge of the legal principles and

historical facts involved and with respect to which I hold myself out as an expert or

statements made or documents provided to me by third parties whose veracity I

reasonably assumed.

Further the Affiant sayeth naught.

At Chagrin Falls, Ohio

635

Note is confusing at best and in fact may be misleading in the context described

above.

## AFFIRMATION

19. I hereby affirm that I prepared and have read this Affidavit and that I believe the

foregoing statements in this Affidavit to be true. I hereby further affirm that the basis

of these beliefs is either my own direct knowledge of the legal principles and

historical facts involved and with respect to which I hold myself out as an expert or

statements made or documents provided to me by third parties whose veracity I

reasonably assumed.

Further the Affiant sayeth naught.

At Chagrin Falls, Ohio

December 5, 2003

WALKER F. TODD (Ohio bar no. 0064539)
Expert witness for the Defendants
Walker F. Todd, Attorney at Law
1164 Sheerbrook Drive
Chagrin Falls, Ohio 44022
(440) 338-1169, fax (440) 338-1537
e-mail: westodd@adelphia.net

### NOTARY'S VERIFICATION

At Chagrin Falls, Ohio
December 5, 2003

On this day personally came before me the above-named Affiant, who proved his identity
to me to my satisfaction, and he acknowledged his signature on this Affidavit in my presence and
stated that he did so with full understanding that he was subject to the penalties of perjury.

Notary Public of the State of Ohio

L. A. LECHMAN, Notary Public
State of Ohio, Geauga County
My Commission Expires Sept. 5, 2009

# PLAINTIFFS CERTIFICATE OF SERVICE

AVILA et al v. NEWREZ d/b/a SHELLPOINT et al .          Case# 2:24-cv-2264

I, the undersigned, hereby certify that on October 23, 2024, that a true and correct attached documents:

1.  RESPONSE TO DEFENDANTS MOTION TO DISMISS
2.  CERTIFICATE OF SERVICE

   By method(s):

☐ HAND DELIVERY          ☐US Mail          ☐ FAX          [ ] EMAIL

Is Submitted to:

[ ] ATTORNEYS OF DEFENDANTS

☑ UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA

Tony Pellegrino

1034 River Ave.

Oakdale Calif. 95361